2001 ND 53

**In the Matter of the ESTATE OF Leo H. DION.**

**Viola Bartusch, Petitioner and Appellant,**

v.

**Kenneth Hager, Personal Representative of the Estate of Leo H. Dion, Respondent and Appellee,**

**Carnegie Library and Devils Lake Area Foundation, Appellee.**

No. 20000178.

Supreme Court of North Dakota.

March 20, 2001.

Viola Bartusch, Elk River, MN, pro se.

Peter K. Halbach, Haugland, Halbach and Halbach, Devils Lake, ND, for respondent and appellee.

J. Thomas Traynor, Jr. (appeared), Traynor, Rutten & Traynor, P.C., Devils Lake, ND, for appellee.

KAPSNER, Justice.

[¶ 1] Viola Bartusch appealed from a judgment and numerous other court orders involving the estate of her late brother, Leo H. Dion. We conclude the trial court did not err in denying her motion for change of venue or in its rulings during and after trial, and did not err in upholding the validity of Dion's June 1998 will. We affirm.

I

[¶ 2] Leo Dion was born February 1, 1917, near Lakota. Dion had 12 siblings and moved away from home when he was 13 years old. In 1942, Dion married Frances, a school teacher 19 years his senior who had graduated from Mayville State College. After serving and being wounded in World War II, Dion attended the North Dakota State College of Science at Wahpeton.

[¶ 3] Frances taught school for 52 years in North Dakota, Illinois and Minnesota, while Dion worked at various odd jobs. When the couple moved to Alexandria, Minnesota, Leo worked at the Post Office. The couple had no children of their own and lived frugally. The couple accumulated a substantial amount of money during their lifetimes.

[¶ 4] Viola Bartusch is Dion's younger sister. When Frances became ill in 1986, Bartusch stayed with Dion and helped him care for Frances. Frances died on May 16, 1986, and Dion was distraught. That same day, Bartusch went to an attorney's office with Dion where he had a will prepared. Bartusch understood she would receive a part of Dion's estate and she would be the personal representative. After Frances died and Dion's health began to deteriorate, Bartusch stayed with Dion in Alexandria for periods of time to assist him. Bartusch organized Dion's financial papers and knew he had a substantial amount of money. In 1985, Bartusch began keeping a journal, listing the things she did for Dion.

[¶ 5] In 1997, Dion moved to Devils Lake to be closer to where Frances was buried. Dion initially moved into Lake Country Manor, a nursing home, but he became irritable and depressed and decided to move from the nursing home to an apartment at Heartland Court in August 1997. Dion was physically incapacitated, and Patsy Hood was one of several caregivers who worked with Dion, giving him 24–hour care at his apartment. Hood eventually opened a joint bank account with Dion, and in November 1997, Dion signed a power of attorney appointing Hood as his attorney in fact.

[¶ 6] Dion visited several times with one of his nieces and told her he had been thinking about what Frances might have wanted him to do with their money. Dion mentioned his college in Wahpeton and Frances' college in Mayville. Dion thought education was important, and mentioned as possibilities "something to do with Lake Region, or Devils Lake area." Dion also mentioned he wanted to leave something for the young girls who used to live next door to him in Alexandria. Hood contacted attorney Melvin Christianson for Dion, and Dion began discussing his estate plans with Christianson.

[¶ 7] Dion's relationship with Bartusch had begun to sour. He would get upset with his sister because, according to a friend from Alexandria, "[h]e felt that she was controlling and bossy...." Dion did not mention his family while discussing estate planning because he believed they were "taking advantage of him." For Christmas 1997, Dion received a card and letter from Bartusch which included a list charging Dion for food, gas and labor at $50 per day for periods of 1996 and 1997. The list totaled more than $8,800, with credit given for money earlier paid to Bartusch. Bartusch wrote Dion, "I *sure Hope & Pray You Find it in ... Your Heart that I Receive* some of my *List Before the Season is out.*" (Emphasis in original.) Bartusch signed the letter, "In God we Trust." When Dion saw Bartusch again, he told her, "I can't understand how a sister could do this to me." He told her to leave because she caused him stress.

[¶ 8] Dion had a total of 13 meetings with Christianson in December 1997 and January 1998 to discuss estate planning and prepare a will. Dion showed little interest in leaving money to his family, but wanted to leave money to the schools he and his wife had attended. He also wanted to leave something for his former neighbors' children. He also became interested in leaving money to the Carnegie Library after discussing the subject with his dentist, who served as the library board president. Dion met with the library board and with members of the North Dakota State College of Sciences Foundation to discuss endowments.

[¶ 9] Dion became severely ill in January 1998 and was taken to a hospital in Grand Forks. Christianson prepared a will and Dion signed it on January 29, 1998, while he was hospitalized. According to Christianson, Dion verbally confirmed the devises and discovered Bartusch's first name, Viola, had been misspelled as "Violet." The misspelling was corrected by drawing a line through it and entering the correct spelling above it; Dion initialed the change. The January 1998 will included devises

of $50,000 to Dion's brother, Everett Dion; $10,000 to Everett Dion's granddaughter; $1,000 to another brother, Luke Dion; $1,000 to Bartusch; $300,000 to the Carnegie Library; $65,000 to the Mayville State University Alumni Foundation; $90,000 to the North Dakota State College of Sciences Foundation; $30,000 in trust to the three children of his former neighbors in Alexandria; $140,000 to Colleen Quinn, a friend from Alexandria; and $100,000 to Hood. Small devises were also given to others and the residue of the estate was devised to the Devils Lake Area Foundation in accordance with an endowment agreement. Dion nominated Hood to be personal representative of his estate.

[¶ 10]   After visiting with Dion when he returned to his apartment from the hospital, Bartusch hired an attorney and filed a petition for appointment of a guardian and conservator for Dion. Bartusch was appointed temporary guardian on March 2, 1998, pending the formal guardianship and conservatorship hearing. Fearing Hood was stealing money from Dion, Bartusch proceeded to transfer all of the money out of Hood and Dion's joint account. Dion retained attorney Michael N. Steffan, who was later appointed to be Dion's guardian ad litem. Dion instructed Steffan to obtain money Hood had deposited by check into her personal account. The court ordered the bank to place the $25,088.47 in an interest-bearing account in Dion's name. Hood consented to the transfer of funds. When questions arose over Bartusch's handling of Dion's funds, Bartusch stipulated to have Ken Hager, the Ramsey County public administrator, serve as Dion's temporary guardian and conservator, and an order of substitution was entered on March 13, 1998. Before the guardianship hearing, Dion prepared a handwritten note addressed "To whom it may concern: I do not want my sister Vi to have control of my money."

[¶ 11]   The guardianship hearing was held by District Court Judge Lee A. Christofferson on March 19, 1998, at Dion's apartment. By then, according to Bartusch's notes, Dion's condition had improved dramatically. Judge Christofferson found "no basis for a guardianship." According to the judge, "there was nothing wrong with his mental capacity. He was alert, he was tracking, he was basically keen as to what was going on." The judge, however, ordered a limited conservatorship. The judge explained, because Dion's "mind was keen and it appeared he had accumulated significant assets by his own decisions, I left those with him. What he really needed was someone to physically go and do things, or sort of make sure those assets were not wasted."

[¶ 12]   Because of all the people suddenly involved in Dion's life, and Dion's perceived vulnerability, the judge suggested a new will should be prepared. The judge said, "I wanted him to get away to another attorney to just talk about what he really wanted to do with his estate, and then memorialize that in a new will." At the guardianship hearing, the judge explained, "I wasn't suggesting that it be a different Will. That's up to him but a new one in the sense that it was done at a different location after discussion with an independent attorney." The court noted, "If Leo refuses to cooperate so be it." One of the provisions in the formal court order appointing Hager as limited conservator stated:

8.   Mr. Dion shall redraft any recently executed last will and testament and his guardian ad litem is instructed to assist Mr. Dion in locating a suitable attorney unrelated to these proceedings to accomplish the redrafting of a last will and testament, and for the guardian ad litem to assist Mr. Dion and such chosen counsel in obtaining necessary services to establish his competency by means of a suitable examination, video taping of proceedings, or other like measures which may assist Mr. Dion's exe-

cution of a further last will and testament.

[¶ 13] According to Steffan, Dion did not think he was required to redraft the will because the court found he was competent, and he indicated to Steffan he was not going to redraft the will because he did not want to incur needless expenses. Dion later changed his mind and told Steffan he was thinking of redrafting his will. Steffan suggested having another attorney, Michael Klemetsrud, participate in the process to comply with the court's order and satisfy Dion. According to Steffan, Dion consented to Klemetsrud's involvement and "it was Leo's choice as to what involvement Mike Klemetsrud would have" in the will redrafting process. Steffan said Klemetsrud was "someone at least independent to previous proceedings [who would be] there to talk with Leo, to ensure that this is something that Leo wanted, and that nobody was applying any undue influence."

[¶ 14] On May 8, 1998, Steffan and Klemetsrud met with Dion and reviewed the January 1998 will. Dion corrected the spelling of names and corrected a devise to the Lutheran Church by changing the location of the church from Devils Lake to Alexandria. Dion had the $1,000 devise to his brother, Luke, crossed out because Luke had died. Dion also deleted a small devise to another person. Dion rejected the suggestion of his brother, Everett, being the personal representative, and decided his limited conservator, Hager, should serve in that role. There was no discussion of removing the devise to Hood from the will at that time.

[¶ 15] In June 1998, Dion moved from Devils Lake to a nursing home in Lakota where he had grown up. Because of the level of care he required, Dion decided it would cost less than maintaining his own staff at an apartment. While in Lakota, Dion decided to eliminate the $100,000 devise to Hood from the will.

[¶ 16] Dion signed the new will on June 18, 1998, and revoked Hood's power of attorney. Klemetsrud was there, met with Dion alone, and Dion indicated to him "the will was fine." The major devises in the June 1998 will were the same as in the January 1998 will, except the $100,000 devise to Hood was removed.

[¶ 17] Dion was eventually moved to another nursing home in Anoka, Minnesota, where he died on January 16, 1999. Hager filed an application for informal probate and was appointed personal representative of Dion's estate. In March 1999, Bartusch filed a petition to set aside Dion's will. The amended petition claimed a May 16, 1986 lost will, which left Bartusch and Everett Dion each 50 percent of Dion's estate, should be probated rather than the January 1998 or June 1998 wills. Bartusch alleged Dion did not have the testamentary capacity to execute the 1998 wills and those wills "were executed as a result of undue influence and duress." Bartusch's motion to change venue from Ramsey County to Nelson County was denied. A five-day jury trial was held in March 2000. At the close of Bartusch's case, the court directed verdicts against Bartusch on her claims the June 1998 will was the result of the undue influence of Steffan or Hood. The jury found Dion had testamentary capacity when he executed the June 1998 will. Judgment was entered awarding statutory costs and disbursements against Bartusch in March 2000. Bartusch's motions to vacate the judgment and grant a new trial were subsequently denied, and the trial court awarded the defendants attorney fees incurred in responding to the post-trial motions. Bartusch appealed.

## II

[¶ 18] Bartusch contends the trial court erred in refusing to transfer venue of the trial to Nelson County. Bartusch argues a change of venue was warranted because the Carnegie Library would receive $300,000 from Dion's $800,000 estate under the June 1998 will and, because

Ramsey County and the City of Devils Lake fund the "County City library," the "District Court of Ramsey County presided over a civil matter with itself as a real party in interest." We interpret Bartusch's argument to be an impartial trial was impossible ·in Ramsey County because the county itself, as well as its taxpayers, were primary parties in the will contest.

[¶ 19] A defendant has a statutory right to have an action tried in the county of the defendant's residence, "subject to the power of the court to change the place of trial as provided" by statute. N.D.C.C. § 28–04–05. *See Slaubaugh v. Slaubaugh,* 499 N.W.2d 99, 106 (N.D.1993). The statutory right to a trial in the defendant's home county is a significant factor in determining venue and should not be denied except for good cause. *Porth v. Glasoe,* 522 N.W.2d 439, 441 (N.D.1994). Venue may be changed when there is a reason to believe an impartial trial cannot be held in the county where the action is pending. N.D.C.C. § 28–04–07(2). The party seeking the change in venue has the burden to establish an impartial trial cannot be held in the county from which the transfer is sought. *Jerry Harmon Motors, Inc. v. First Nat'l Bank & Trust Co.,* 440 N.W.2d 704, 708 (N.D.1989). The party moving for the change of venue has the burden of stating facts, not conclusions, to support the change. *Porth,* at 441.

[¶ 20] Whether a change of venue is required to obtain a fair and impartial trial is a question of fact, and we will not overturn a trial court's decision granting or denying a motion for change of venue unless the court abused its discretion. *Eckman v. Stutsman County,* 1999 ND 151, ¶ 7, 598 N.W.2d 494. A trial court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner, or when its decision is not the product of a rational mental process leading to a reasoned determination. *In re S.J.F.,* 2000 ND 158, ¶ 22, 615 N.W.2d 533.

[¶ 21] The only evidence presented in support of the motion were exhibits Bartusch submitted for the 1997 and 1998 tax levies for Ramsey County showing 1.5 mills is assessed annually for the county library. The trial court denied the motion, ruling "[t]he fact that a resident of Ramsey County may receive some indirect benefit from Mr. Dion's gifts is not sufficient cause to change venue." We cannot say the trial court abused its discretion in refusing to change venue.

[¶ 22] While there may be some situations in which a change of venue should be granted when a governmental subdivision is a party and the other party challenges venue because of the potential jurors' status as taxpayers, *see Sheridan County v. Davis,* 61 N.D. 744, 240 N.W. 867 (1932), Bartusch's argument that Ramsey County and its taxpayers are actually parties to this proceeding is unpersuasive. The record establishes that Carnegie Library is an entity distinct from Ramsey County, governed by a seven-member board appointed by the Devils Lake city commission and Ramsey County commission. Moreover, although the county imposes a 1.5 mill levy for the library, we have consistently held that an affidavit which merely asserts that an action is one against a political subdivision and that prospective jurors are taxpayers of the political subdivision is insufficient in itself to effect a change of venue under N.D.C.C. § 28–04–07(2). *See Haugo v. Haaland,* 349 N.W.2d 25, 28 (N.D. 1984); *Marshall v. City of Beach,* 294 N.W.2d 623, 627 (N.D.1980); *Hanson v. Garwood Indus.,* 279 N.W.2d 647, 650 (N.D.1979). Bartusch in this case has done no more than assert potential jurors are taxpayers subject to the mill levy for the library.

[¶ 23] Bartusch's reliance on *Willesen v. Davidson,* 249 Iowa 1104, 90 N.W.2d 737, 738–39 (Iowa 1958), is misplaced because the decision is based on an Iowa statute mandating a change of venue when a county is a party to the action. North Dakota has no similar statute. Bartusch

also relies on *Linington v. McLean County*, 150 N.W.2d 239 (N.D.1967), in which this Court affirmed a trial court's decision granting a motion for change of venue. *Linington* merely illustrates the broad discretion afforded trial courts in granting or denying change of venue motions.

[¶ 24] In *Marshall*, 294 N.W.2d at 627, we said N.D.C.C. § 28–14–06(5), which does not allow challenges for cause based on a person's interest as a member or citizen of a political subdivision, "recognizes that where juror interest in the outcome of a suit extends no further than to effect [sic] him as an ordinary taxpayer, the resident or taxpayer is still a competent juror not subject to a challenge for cause." We noted, however, that "[w]hether or not their interest as taxpayers will impair their ability to act fairly and impartially is, nevertheless, a proper subject of inquiry on voir dire examination." *Id.* In this case, voir dire was conducted off the record, rendering it impossible for us to review Bartusch's claim she was unable to receive a fair trial before an impartial jury in Ramsey County.

[¶ 25] We conclude Bartusch has failed to establish the trial court abused its discretion in denying her motion for change of venue.

### III

■ [¶ 26] Bartusch's primary argument on appeal is the June 1998 will is invalid because "Judge Christofferson and his court-appointed agents illegally made the will."

[¶ 27] Dion was a "protected person" when the trial court granted Hager a limited conservatorship. *See* N.D.C.C. § 30.1–26–01(4). With respect to a protected person, a court has "all the powers over the person's estate and affairs which the person could exercise if present and not under disability, except the power to make a will." N.D.C.C. § 30.1–29–08(2)(c). This statute forbids a court from making a will for a protected person. *See Matter of Conservatorship of Sickles*, 518 N.W.2d 673, 679 (N.D.1994). Bartusch claims the trial court's formal order stating "Dion shall redraft any recently executed last will and testament" invalidates the June 1998 will because the order violates N.D.C.C. § 30.1–29–08(2)(c).

■ [¶ 28] We reject the contention that the trial court and its "agents" somehow "made" Dion's June 1998 will. The record unequivocally establishes that Dion, not the court, made Dion's will. *See* N.D.C.C. § 30.1–08–01. The will is in writing, is signed by Dion, and is signed by two witnesses. *See* N.D.C.C. § 30.1–08–02(1). Dion was the testator, and Steffan prepared the will as Dion's attorney according to Dion's stated wishes. *See, e.g., Hitz v. Estate of Hitz*, 319 N.W.2d 137, 139 (N.D.1982). Klemetsrud was hired as independent counsel to serve as an impartial observer over Dion's execution of the will. At the guardianship and conservatorship hearing Bartusch agreed to involve independent counsel, and to place Steffan in charge of contacting that person. There is no evidence the court, Steffan or Klemetsrud forced Dion to sign the June 1998 will. Bartusch's claim the court and its agents "made" Dion's will in violation of N.D.C.C. § 30.1–29–08(2)(c) is without merit. Bartusch's related claim the will is invalid because the court failed to follow the procedures governing the ante-mortem probate of wills under N.D.C.C. ch. 30.1–08.1 is equally without merit. Any person who executes a will "may institute" an action for a judgment declaring the validity of the will. N.D.C.C. § 30.1–08.1–01. This procedure is not a requirement.

■ [¶ 29] The wording of Judge Christofferson's order appointing Hager limited conservator is unfortunate. The direction that "Dion shall redraft any recently executed last will and testament" was, as the trial court concluded in this case, unenforceable as a matter of law. Obviously, a court has no power to order anyone to execute a will, and the trial court properly instructed the jury in this

case that "[a] Court or judge cannot order a person to make out a Will or how to make out a Will nor can a Court order additional formal requirements before a Will can be found valid." The power to make a will belongs to the testator and is not subject to veto power of the courts. *Matter of Estate of Anderson*, 671 P.2d 165, 169 (Utah 1983). As this Court said in *Stormon v. Weiss*, 65 N.W.2d 475, 505 (N.D.1954), "[a] competent testator may dispose of his property as he wishes without regard to the desires of prospective beneficiaries or the views of juries or courts so long as the terms of the will are not prohibited by law, or opposed to public policy."

[¶ 30] It is apparent from the record that Judge Christofferson suggested Dion execute a new will with safeguards in place in an unsuccessful attempt to thwart a will contest. All present at the guardianship and conservatorship hearing held in Dion's apartment, including Bartusch and her attorney, appear to have concurred that Dion did not have to make out a new or different will if Dion did not want to do so.

[¶ 31] Notwithstanding the court's order which was invalid insofar as it directed Dion to make a new will, the record shows the decision to make out a new will was left to Dion. The court did not "make" Dion's will. Consequently, the trial court did not err in denying Bartusch's summary judgment motion on the grounds the will was made by the court, and because a court need not instruct the jury on a theory when there is no evidence to support it, *see Harfield v. Tate*, 1999 ND 166, ¶ 6, 598 N.W.2d 840, the court did not err in rejecting Bartusch's proposed jury instructions relating to a "court-made will."

IV

[¶ 32] Bartusch claims the trial court erred in granting directed verdicts against her on her claims Steffan and Hood exerted undue influence on Dion in executing the June 1998 will.

[¶ 33] A trial court's decision on a motion brought under N.D.R.Civ.P. 50 to grant or deny judgment as a matter of law is based upon whether the evidence, when viewed in the light most favorable to the party against whom the motion is made, leads to but one conclusion as to the verdict about which there can be no reasonable difference of opinion. *Felco, Inc. v. Doug's North Hill Bottle Shop*, 1998 ND 111, ¶ 8, 579 N.W.2d 576. In determining whether the evidence is sufficient to create an issue of fact, the trial court must view the evidence in the light most favorable to the non-moving party and must accept the truth of the evidence presented by the nonmoving party and the truth of all reasonable inferences from that evidence. *Symington v. Mayo*, 1999 ND 48, ¶ 4, 590 N.W.2d 450. A trial court's decision on a motion for judgment as a matter of law is fully reviewable on appeal. *Peterson v. Traill County*, 1999 ND 197, ¶ 7, 601 N.W.2d 268.

[¶ 34] Undue influence is characterized by four elements: 1) the testator is subject to such influence; 2) the opportunity to exercise undue influence existed; 3) there was a disposition to exercise such influence; and 4) the result appears to be the effect of such influence. *In re Estate of Robinson*, 2000 ND 90, ¶ 10, 609 N.W.2d 745. For the issue of undue influence to be submitted to a jury, the evidence must be sufficient with regard to each essential element of the claim and the evidence must also create more than just a mere suspicion of undue activity. *Perry v.. Reinke*, 1997 ND 213, ¶ 13, 570 N.W.2d 224.

[¶ 35] The evidence shows Steffan asked what Dion wanted in his will and Dion made the decisions, even rejecting Steffan's suggestion about a possible personal representative of the estate. Klemetsrud did not witness Steffan exerting any pressures on Dion. The record shows what was in the will was a result of Dion's wishes as refined during Dion's initial estate planning sessions with attorney Chris-

tianson. Christianson was unaware of any involvement by Hood in Dion's estate planning even prior to the January 1998 will. Bartusch's theory that Steffan forced Dion to remove the $100,000 devise to Hood is not supported by any evidence and is pure speculation. Bartusch's intimation that Hood unduly influenced Dion to remove Hood's own $100,000 devise is also not supported by any evidence and is totally illogical.

[¶ 36] Nor can we find any evidence in the record that Dion was unduly influenced to make a new will by the existence of Judge Christofferson's formal order. Dion was not threatened with contempt proceedings, and there is no evidence that Dion believed he had to comply with the court's order. When questioned whether he discussed paragraph 8 of the court's order with Dion, Steffan testified:

A. Yes, we did, and we put that issue to rest, you know, shortly after reviewing that order. Leo felt those were suggestions of the Court, especially since the Court found that he was competent and not in need of a guardian, and that they were suggestions; that was Leo's interpretation of them. He questioned me on them. I concurred in his evaluation of it.

. . . .

The Court, in my opinion—my understanding of the hearing was that, first of all, the Court order indicated that the petition was dismissed, and that—and that Leo was competent and was not in need of a guardian. And then there were some discussions as to if certain things were—there are certain tools and certain things to consider, and it was all premised on whether or not Leo would do those or wanted to do them.

Although there is evidence that Dion was irritable and depressed at times, that testimony tied Dion's irritability and depression to either his deteriorating physical condition, his displeasure with having to live in a nursing home, or Bartusch's presence and perceived attempts to gain control of his finances.

[¶ 37] There is no evidence to suggest Dion was unduly influenced to execute the June 1998 will by Steffan, Hood, or the existence of the court's order. The trial court did not err in granting the motion for judgment as a matter of law on Bartusch's claims of undue influence.

V

[¶ 38] Bartusch challenges the jury's finding Dion had testamentary capacity when he executed the June 1998 will.

[¶ 39] In *Stormon v. Weiss*, 65 N.W.2d 475, 504–05 (N.D.1954), this Court explained testamentary capacity:

Testator must have sufficient strength and clearness of mind and memory, to know, in general, without prompting, the nature and extent of the property of which he is about to dispose, and nature of the act which he is about to perform and the names and identity of the persons who are to be the objects of his bounty, and his relation towards them. He must have sufficient mind and memory to understand all of these facts; . . . . He must also be able to appreciate the relations of these factors to one another, and to recollect the decision which he has formed.

[¶ 40] A will contestant has the burden of proving testamentary incapacity by a preponderance of the evidence. *Matter of Estate of Wagner*, 551 N.W.2d 292, 296 (N.D.1996). A determination of testamentary capacity, or the lack of it, is a question of fact for the trier of fact. *Matter of Estate of Mickelson*, 477 N.W.2d 247, 251 (N.D.1991). We review questions of fact tried to the jury in the light most favorable to the verdict, and we affirm the jury's decision if there is substantial evidence to support the verdict. *Fode v. Capital RV Ctr., Inc.*, 1998 ND 65, ¶ 26, 575 N.W.2d 682.

[¶ 41] There is substantial evidence Dion had testamentary capacity when he executed his will on June 18, 1998. Judge Christofferson and attorneys Klemetsrud and Steffan testified that Dion had the testamentary capacity to make a will. The evidence shows a consistency in Dion's estate planning, and Dion personally met with some devisees. The evidence established Dion knew the extent of his assets and knew of his living family members. A psychologist who reviewed Dion's medical records and various legal documents and transcripts, including the results of a mental examination conducted the day before the will was signed, testified Dion had testamentary capacity.

[¶ 42] We conclude there is substantial evidence supporting the jury's finding that Dion had testamentary capacity when he signed the June 1998 will.

## VI

[¶ 43] Bartusch argues the trial court erred in awarding costs, disbursements, and attorney fees against her.

[¶ 44] Under N.D.C.C. § 28–26–10, costs may be allowed for or against either party in the discretion of the court, and we will not overturn a court's decision on costs unless the court abused its discretion. *Blackburn, Nickels & Smith, Inc. v. National Farmers Union Property & Cas. Co.*, 482 N.W.2d 600, 605 (N.D.1992). Under N.D.C.C. § 28–26–06, the clerk is directed to tax, as part of the judgment in favor of the prevailing party, that party's necessary disbursements as enumerated in the statute. *National Farmers Union Property & Cas. Co.*, 482 N.W.2d at 605. Bartusch has not persuaded us the trial court abused its discretion in awarding costs, and because the defendants were the prevailing parties, the court properly awarded disbursements to them.

[¶ 45] The defendants sought attorney fees under N.D.R.Civ.P. 11 and N.D.C.C. § 28–26–01(2) for defending a frivolous claim for relief. The trial court found Bartusch's post-trial motions were frivolous and awarded the defendants attorney fees incurred only in defending the post-trial motions.

[¶ 46] A claim for relief is frivolous under N.D.C.C. § 28–26–01(2) only if there is such a complete absence of actual facts or law a reasonable person could not have expected a court would render a judgment in that person's favor. *Industrial Comm'n v. McKenzie County Nat'l Bank*, 518 N.W.2d 174, 178 (N.D. 1994). An award of attorney fees under the statute lies within the sound discretion of the trial court, and its determination will be disturbed on appeal only for an abuse of discretion. *Nygaard v. Continental Res., Inc.*, 1999 ND 172, ¶ 16, 598 N.W.2d 851.

[¶ 47] The vast majority of Bartusch's arguments in the post-trial motions related to her meritless claim Dion's will was a "court-made will." This spurious argument, made without any factual basis, had been repeatedly rejected by the trial court in pretrial rulings and rulings made during the trial. On this record, we cannot say the trial court abused its discretion in awarding the defendants attorney fees incurred in defending this frivolous claim once again in Bartusch's post-trial motions.

## VII

[¶ 48] We have considered Bartusch's other arguments and deem them to be without merit. The defendants request attorney fees under N.D.R.App.P. 38 for defending a frivolous appeal. Although some of Bartusch's arguments are frivolous, others are not, and we deny the request. The judgment and other orders are affirmed.

[¶ 49] VANDE WALLE, C.J., and SANDSTROM, NEUMANN, and MARING, JJ., concur.