2000 ND 90

In the Matter of the ESTATE OF R.R. ROBINSON a/k/a Robert R. Robinson, Deceased.

Patricia K. Huffman, and Bette Ann Violet, Appellants and Cross–Appellees,

v.

Bonnie J. Maehlmann, Personal Representative of the Estate of R.R. Robinson a/k/a Robert R. Robinson, and Bonnie J. Maehlmann, individually, Appellees and Cross–Appellants.

Nos. 990319, 990322.

Supreme Court of North Dakota.

April 28, 2000.

Arlen M. Ruff, Kelsch, Kelsch, Ruff & Kranda, Mandan, N.D., for appellant and cross-appellee, Bette Ann Violet.

Gregory C. Larson and Courtney McDonald Koebele (appeared), Wheeler Wolf, Bismarck, N.D., for appellant and cross-appellee, Patricia K. Huffman.

Charles T. Edin, Charles T. Edin, P.C. Law Office, Bismarck, N.D., and Morris A. Tschider (appeared), Tschider & Smith, Bismarck, N.D., for appellees and cross-appellants.

MARING, Justice.

[¶ 1] Patricia K. Huffman and Bette Ann Violet appeal from a trial court memorandum opinion, order, and judgment in favor of Bonnie J. Maehlmann, awarding her full ownership of a bank account in which she had been a joint tenant. Maehlmann cross-appeals the trial court's conclusion that the account's original owner Robert R. Robinson, had previously created a valid joint bank account with Huffman. We affirm the trial court's judgment as to Maehlmann's ownership of the account. That conclusion is dispositive of the appeal, thus we do not reach the issue raised in Maehlmann's cross-appeal. *See Wacker Oil, Inc. v. LoneTree Energy, Inc.* 459 N.W.2d 381, 382 (N.D.1990).

I.

[¶ 2] Robinson was married to Esther Robinson, Huffman's mother, from 1960 until Esther's death in 1995. Robinson had held a bank account at Farmers Security Bank of Washburn in joint tenancy with his wife during her life and was the account's sole owner after her death. In March of 1996, Robinson wrote to Huffman, stating that he was putting her name as "Joint tenant in the banks." That same month, he executed documents at the bank listing Huffman as a joint tenant. The bank instructed Robinson to have Huffman sign a signature card; however, Robinson never did so. After Robinson's death, his friend and neighbor Mike Nelson, who had helped Robinson with his financial affairs and visited him regularly, found the signature card among papers Robinson had given him. The bank sent out at least six statements addressed to "R R Robinson or Patricia K Huffman."

[¶ 3] In 1997, Maehlmann, who was Robinson's niece, began coming to visit and to

care for him. Maehlmann visited Robinson four times; during these visits, Maehlmann took care of Robinson's personal needs, cleaned his home and read his mail to him.

[¶ 4] On July 7, 1997, Robinson and Maehlmann went to the bank, and Robinson changed the account into a joint tenancy with Maehlmann. A bank employee, Glenda Brown, helped Robinson with this transaction, which took approximately 20–30 minutes. Maehlmann asked that the bank send statements to her, and the bank complied, even after Robinson told the bank not to send statements to Maehlmann. Maehlmann wrote several checks on the account, including one to herself for $8,000, even though she knew Robinson would not approve. In November of 1997, Maehlmann used $313,000 from the account to purchase a certificate of deposit, doing so without Robinson's permission.

[¶ 5] During the last year of his life, Robinson suffered a variety of medical problems and was hospitalized for several weeks before his death on December 16, 1997. A few months before Robinson died, Maehlmann found a typewritten document, which appeared to be an unwitnessed will, leaving Robinson's estate to Nelson and Huffman in equal shares. Maehlmann did not immediately tell Robinson she found the document, but instead put it in her purse. A day or two later, Maehlmann met with an attorney and asked him to draw up a will for Robinson. She also contacted two other attorneys to ask if they would make a will for Robinson. She eventually showed the document to Robinson when he was in the hospital, shortly before his death, and asked him if he wanted his estate distributed according to that document. Maehlmann says Robinson tore up the document and said it meant nothing to him; however, she saved the pieces of this document. Maehlmann wrote to Violet, Robinson's other niece, instructing her not to tell anyone about the purported will because it would just cause problems and foster litigation. Maehlmann told Violet that when Nelson asked her whether a will existed, she simply said no.

[¶ 6] After Robinson's death, Maehlmann claimed the funds in the bank account as a joint tenant with right of survivorship and sought appointment as the personal representative for the estate. Huffman and Nelson objected to her appointment. Huffman also cross-claimed against Maehlmann, arguing Maehlmann was in a relationship of trust and confidence with Robinson and Maehlmann exerted undue influence over Robinson to get him to change ownership of the bank account.

[¶ 7] Following a trial, the trial court issued a memorandum opinion in which it concluded Robinson created a valid joint tenancy account with Huffman. Though the trial court concluded Maehlmann was in a relationship of trust and confidence with Robinson, giving rise to a presumption of undue influence, the trial court also determined Maehlmann rebutted the presumption. The trial court issued its findings of fact, conclusions of law and order, and the judgment in accordance with its memorandum opinion.

## II.

[¶ 8] Huffman and Violet claim the trial court's finding that Maehlmann rebutted the presumption of undue influence is clearly erroneous. We disagree.

### A.

[¶ 9] Section 59–01–08, N.D.C.C., states "[e]veryone who voluntarily assumes a relation of personal confidence with another is deemed a trustee...." Finding a confidential relationship under N.D.C.C. § 59–01–08 triggers a presumption of undue influence under N.D.C.C. § 59–01–16. *Matter of Estate of Dinnetz,* 532 N.W.2d 672, 674 (1995). Under that section, transactions between the trustee and the trustee's beneficiary, in which the trustee gains an advantage, are presumed to have been

made without sufficient consideration by the trustee's beneficiary and under undue influence. N.D.C.C. § 59–01–16. This presumption applies in cases in which one in a relation of personal confidence makes changes to or acquires an interest in bank accounts. *Estate of Dinnetz*, at 673–74; *see also Estate of Wenzel–Mosset by Gaukler v. Nickels*, 1998 ND 16, ¶ 24, 575 N.W.2d 425. Once the presumption under N.D.C.C. § 59–01–16 has been established, the trustee bears the burden to present evidence to rebut the presumption. *Estate of Dinnetz*, at 675.

[¶ 10] In cases involving will contests, we have defined undue influence as the substitution of the purpose and intent of the one exercising influence for the purpose and intent of the testator. *Matter of Estate of Herr*, 460 N.W.2d 699, 702 (N.D. 1990). This Court has stated that undue influence is characterized by four elements: the testator is subject to such influence; the opportunity to exercise undue influence existed; there was a disposition to exercise such influence; and the result appears to be the effect of such influence. *Matter of Estate of Mickelson*, 477 N.W.2d 247, 250 (N.D.1991). Undue influence is seldom exercised openly; because direct evidence is rarely available, undue influence may be proven by circumstantial evidence. *See Estate of Davis v. Cook*, 9 S.W.3d 288, 293 (Tex.App.1999); *Matter of Estate of Bayer*, 574 N.W.2d 667, 671 (Iowa 1998); *Redman v. Watch Tower Bible and Tract Soc. of Pennsylvania*, 69 Ohio St.3d 98, 630 N.E.2d 676, 679 (Ohio 1994); *In re Estate of Larson*, 394 N.W.2d 617, 620 (Minn.Ct.App.1986).

[¶ 11] The determination of whether undue influence exists is a question of fact. *Estate of Mickelson*, 477 N.W.2d at 250. Under N.D.R.Civ.P. 52(a), this Court will not set aside a trial court's finding of fact unless it is clearly erroneous. *Matter of Estate of Nelson*, 553 N.W.2d 771, 773 (N.D.1996). A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evi-

dence supports it, or if, on the entire record, this Court is left with a definite and firm conviction a mistake has been made. *Id.* If reasonable evidence in the record supports the trial court's findings, this Court will not retry the case and substitute findings of fact it might have made for those made by the trial court. *Id.* at 774.

#### B.

[¶ 12] The parties presented extensive testimony from a number of witnesses relating to all four elements of undue influence. First, the trial court heard evidence Maehlmann had an opportunity to influence Robinson. Nelson testified when Maehlmann visited Robinson, she controlled Robinson's schedule and activities. Before and between Maehlmann's visits, Nelson saw Robinson on almost a daily basis, but when Maehlmann came to visit, Nelson saw Robinson far less often and did not feel welcome to visit him.

[¶ 13] Second, the trial court heard evidence Robinson was susceptible to undue influence during the last year of his life. His letters to Huffman indicate he was lonely, and Huffman testified Robinson once cried when she and her husband had to leave him. Huffman also testified Robinson became confused on a trip to visit his wife's grave and could not find her gravesite. Medical records indicated Robinson complained of loneliness and suffered from short term memory loss, dementia, and depression. Other witnesses, however, testified Robinson was capable of making his own decisions. Nelson testified he helped Robinson with his finances and stated he believed Robinson's ability to direct his affairs diminished during the last year of his life; however, Nelson also admitted everyone who helped Robinson "followed his direction and did what he told them to do." In addition, Brown testified that during her encounter with Robinson at the bank he seemed decisive. According to Brown, Robinson directed the meeting during which he changed ownership of the bank account and Maehlmann

simply sat quietly. Finally, Maehlmann testified Robinson directed his own financial affairs both at home during her visits and during the meeting at the bank when he changed the account.

[¶ 14] Third, whether Maehlmann had a disposition to exercise undue influence was also fully before the trial court. Nelson testified on the day he first met Maehlmann she surprised him by commenting on the disposition of her uncle's estate saying, "I suppose he is leaving all his money to Boys Town?" Maehlmann acknowledged she was disinherited in the will of another uncle from whom she had expected to receive property and that this event hurt her. Maehlmann testified upon learning Robinson held his bank account jointly with Huffman, she considered discontinuing her visits to Robinson because she and her husband "weren't included in anything." Maehlmann admitted that after she found the purported will in Robinson's home she contacted three attorneys because she wanted Robinson to make a will "to ensure that I get the funds that he said I was going to have." Maehlmann also admitted confronting Robinson with the will while he was in the hospital and saying to him that she was "surprised that he would ... ask me to come take care of him, and then just leave me entirely out of everything." Maehlmann further stated she told Robinson she felt she'd been used. In contrast, the trial court heard Maehlmann's testimony that during her visits she simply did whatever Robinson wanted regarding his financial affairs. Maehlmann also testified she was very surprised when Robinson said he wanted to put her name on his bank account. Though Brown did not corroborate, Maehlmann testified that, during the meeting at the bank, she attempted to persuade Robinson to leave Huffman's name on the account and suggested she and Huffman could share the account.

[¶ 15] Finally, the trial court heard evidence regarding whether the change in the account was the result of undue influence.

Witnesses testified Robinson repeatedly said he wanted to leave money to Huffman, and that Robinson and Huffman had a good relationship, such that Robinson told others Huffman always "treated him like a daughter." Huffman and her husband contacted Robinson frequently, and Robinson signed letters to Huffman and her husband, "Love, Robby." Nelson testified Robinson repeatedly stated he intended the money in the bank account to go to Huffman. According to Nelson, Robinson expressed this intent until he died, even after he changed the ownership of the account. Nelson said Robinson told him Huffman should get the money because she provided care to Esther during the time before Esther's death. Finally, Huffman asserted the purported will leaving half of Robinson's estate to her was evidence of Robinson's love for her and his intent that she take from his estate. Maehlmann testified to the contrary regarding Robinson's relationship with Huffman. She testified her family believed Robinson never liked Huffman and had delayed his marriage to Esther because he didn't want Huffman around. She also listed four, more recent reasons Robinson disliked Huffman: (1) Robinson believed Huffman drank too much; (2) Huffman did not contact Robinson; (3) Huffman and her mother removed furniture from Robinson's home when Esther moved to Iowa shortly before her death; and (4) Robinson believed Huffman did not adequately supervise her children when they came to visit him. Maehlmann testified that while changing the account at the bank, Robinson stated he didn't care for Huffman and that when she confronted Robinson with his typewritten will at the hospital, Robinson tore up the document saying it meant nothing to him.

### C.

[¶ 16] In cases involving will contests, other states have considered a variety of "suspicious circumstances" as supportive of a finding of undue influence. One often

mentioned factor is the active participation of the beneficiary in securing the preparation of, or a change in, a will. *See, e.g., Bye v. Mattingly,* 975 S.W.2d 451, 457 (Ky.1998); *Vancil v. Carpenter,* 935 S.W.2d 42, 44 (Mo.Ct.App.1996); *Estate of Gerard v. Gerard,* 911 P.2d 266, 270 (Okla. 1995); *Van Marter v. Van Marter,* 130 Or.App. 500, 882 P.2d 134, 137 (1994); *In re Estate of Julian,* 227 Ill.App.3d 369, 169 Ill.Dec. 552, 592 N.E.2d 39, 44 (1991); *In re Estate of Schroeder,* 441 N.W.2d 527, 532 (Minn.Ct.App.1989); *Mitchell v. Smith,* 779 S.W.2d 384, 388 (Tenn.Ct.App. 1989); *In re Estate of McCauley,* 101 Ariz. 8, 415 P.2d 431, 433–34 (Ariz.1966); *In re Lingenfelter's Estate,* 38 Cal.2d 571, 241 P.2d 990, 999 (1952). In addition, courts in other states have considered the following other factors relevant to a determination that undue influence existed: whether the testator received independent and disinterested advice regarding the will (*Estate of Gerard,* 911 P.2d at 270; *Van Marter,* 882 P.2d at 137; *Mitchell,* 779 S.W.2d at 388); whether there was an unexplained change in the testator's attitude toward those for whom she previously expressed affection (*Van Marter,* 882 P.2d at 137); disinheritance of those the testator probably would have remembered in her will (*Estate of Schroeder,* 441 N.W.2d at 532); whether a recently developed and relatively short period of close relationship existed between the testator and the beneficiary (*Bye,* 975 S.W.2d at 457); whether the disposition under the will was contrary to intentions the testator expressed, both before and after executing the will (*Lingenfelter's Estate,* 241 P.2d at 999; *see also Jarvis v. Tonkin,* 238 Va. 115, 380 S.E.2d 900, 903 (1989); *Mitchell,* 779 S.W.2d at 388; *Estate of McCauley,* 415 P.2d at 434); and whether there was secrecy regarding the will's existence (*Mitchell,* 779 S.W.2d at 388).

[¶ 17] Though Huffman and Violet presented substantial evidence of suspicious behavior on Maehlmann's part, other witnesses testified to the contrary, and we have repeatedly held the trial court is in the best position to weigh conflicting evidence and judge the credibility of witnesses. *Estate of Nelson,* 553 N.W.2d at 774. The trial court found Robinson was a strong-willed, independent and competent man on the day he added Maehlmann's name to the bank account. The record contains evidence which supports this finding. At the bank, Robinson directed the 20 to 30 minute long meeting, while Maehlmann sat quietly in the back, and Brown characterized him as decisive. Brown also testified that, upon Robinson's request, she explained the survivorship feature of the account to Robinson during that meeting and he said he understood her. Maehlmann testified she complied with Robinson's instructions regarding his affairs. Nelson also acknowledged those helping Robinson did as they were told. Based on this evidence, the trial court found Maehlmann successfully rebutted the presumption of undue influence. We conclude, reviewing the record before us, that the trial court's findings are supported by reasonable evidence and are not clearly erroneous. The judgment of the trial court is affirmed.

[¶ 18] WILLIAM A. NEUMANN, DALE V. SANDSTROM, JJ., DONOVAN J. FOUGHTY, D. J., CAROL RONNING KAPSNER, Acting C.J., concur.

[¶ 19] DONOVAN J. FOUGHTY, D.J., sitting in place of VANDE WALLE, C.J., disqualified.