2014 ND 66

Curtis L. ERICKSON, Petitioner and Appellee

v.

Dean OLSEN, Susan Olsen, Bobby Olsen, Clee Raye Olsen, Marion Bergquist, and the Estate of Clarence Erickson, Respondents.

Dean Olsen, Susan Olsen, Bobby Olsen, Clee Raye Olsen, and Marion Bergquist, Appellants.

No. 20130217.

Supreme Court of North Dakota.

April 3, 2014.

Daniel J. Nagle, Mandan, ND, for petitioner and appellee.

David J. Smith (argued), Tyler J. Malm (appeared), and Sheldon A. Smith (on

brief), Bismarck, ND, for respondents and appellants.

KAPSNER, Justice.

[¶ 1]   Dean Olsen, Susan ("Sue") Olsen, Bobby Olsen, Clee Raye Olsen, and Marion Bergquist ("the appellants") appeal a district court judgment invalidating transfers of money and real property from Clarence Erickson to the appellants and invalidating Clarence Erickson's will on the bases of lack of capacity and undue influence. The appellants also appeal a district court order denying the appellants' N.D.R.Civ.P. 52(b) motion to amend the district court's findings and judgment. Because the district court findings were not clearly erroneous, we affirm the district court judgment.   The appellants' appeal of the district court's Rule 52(b) order is dismissed.

## I

[¶ 2]   Clarence Erickson had four natural children from a first marriage: Curtis Erickson, Carol Wolf, Craig Erickson, and Colin Erickson.   Clarence Erickson and his first wife divorced, and Clarence Erickson married Clara Olsen.   Clara Olsen had six children from a previous marriage: Ardis Menager, Marion Bergquist, Larry Olsen, Martin Olsen, Dean Olsen, and Bobby Olsen.   Clarence Erickson and Clara Olsen were married for 28 years until Clara Olsen's death, and all of the children and stepchildren were living at the time of both Clara Olsen and Clarence Erickson's deaths.

[¶ 3]   Clara Olsen and Clarence Erickson lived on a farm outside Bowman, North Dakota.   Bobby Olsen lived approximately two and a half miles away, and Dean Olsen lived approximately three miles away. Bobby Olsen saw Clarence Erickson at least every other day, and Dean Olsen saw Clarence Erickson daily.

Dean Olsen sharecropped on a portion of Clarence Erickson's land.   Three of Clarence Erickson's children lived out of state; Curtis Erickson lived in Minnesota and later moved to Bismarck, North Dakota.

[¶ 4]   Clarence Erickson retired from farming in 1985.   He discontinued his livestock operation in 2003.   Since 2006, Curtis Erickson had noticed Clarence Erickson had gaps in memory and difficulty doing simple mathematical calculations. Sometime prior to Clara Olsen's death in 2009, Clarence Erickson stopped driving. Clarence Erickson's eyesight began deteriorating in 2009.

[¶ 5]   In 2008, Clarence Erickson and Clara Olsen gave Dean and Sue Olsen a cashier's check for over $42,000 to cover the cost of Dean Olsen's hip replacement. While Clara Olsen was still living, Dean Olsen's wife, Sue Olsen, began assisting Clarence Erickson by filling out checks to pay bills.   After Clara Olsen's death in 2009, Clarence Erickson continued to live at the farm.   Sue Olsen saw Clarence Erickson daily and wrote all of his checks. During this time, Sue Olsen wrote two checks to herself, totaling $9,000.   According to Sue Olsen, Clarence Erickson gave her the money as a token of appreciation for her help.

[¶ 6]   Curtis Erickson noticed that, on the day of Clara Olsen's funeral in 2009, Clarence Erickson had no emotion or response.   In November 2009, Curtis Erickson became concerned that Clarence Erickson should not be living alone, and Clarence Erickson moved in with Dean and Sue Olsen.   However, Dean Olsen did not think Clarence Erickson needed constant supervision at that time.

[¶ 7]   In November 2009, January 2010, and February 2010, while Clarence Erickson was living with Dean and Sue Olsen, Sue Olsen wrote a third check to herself

and two checks to her husband from Clarence Erickson's checking account, totaling $12,500. According to Sue Olsen, these checks were also written at Clarence Erickson's direction and in appreciation for her and Dean Olsen's help. According to Sue and Dean Olsen, Clarence Erickson told them not to tell the other siblings about the money transfers.

[¶ 8]  Around February 2010, Bobby Olsen took Clarence Erickson to a law office in Bowman to have a will drafted. In March 2010, Clarence Erickson signed two warranty deeds transferring all of his real property in two parcels—one to Bobby Olsen and one to Dean Olsen—for $200 per acre, despite the estimated value of the land being at least $400 per acre. According to Bobby Olsen, Clarence Erickson sold the land for half of what it was worth because Clarence Erickson felt half of the land should be considered to have belonged to the stepchildren's mother, Clara Olsen.

[¶ 9]  Two days after the land sale, Clarence Erickson was moved to Bismarck to live with Marion Bergquist. While Marion Bergquist was at work, her son and his fiancé would stop by her apartment to check on Clarence Erickson. During the time Clarence Erickson lived with Marion Bergquist, Clarence Erickson's brother died. At the funeral, Clarence Erickson could not recognize one of his sisters. Curtis Erickson and Clarence Erickson's other children became aware of the land sale around June 2010. When asked, Clarence Erickson could not remember any specifics of the transactions.

[¶ 10]  In September 2010, Marion Bergquist took Clarence Erickson to Bowman to sign his will. She and Bobby Olsen also took Clarence Erickson to Wells Fargo Bank in Bowman, where his accounts were closed. New accounts were opened in Clarence Erickson's name at Dakota Community Bank, where Bobby Olsen had accounts.

[¶ 11]  In October 2010, due to concerns for Clarence Erickson's mental health, Curtis Erickson sought and was granted temporary guardianship of Clarence Erickson. After being granted temporary guardianship, Curtis Erickson learned of the change to Clarence Erickson's bank accounts and the checks written to Dean and Sue Olsen in 2009 and 2010. When asked, Clarence Erickson was unable to provide any explanation for the transactions and had no clear memory of the events or details surrounding the transactions.

[¶ 12]  After becoming temporary guardian, Curtis Erickson moved his father into his home, where he noticed that his father would become confused, especially in the evenings, and had difficulty staying asleep. Clarence Erickson also frequently got up in the middle of the night and began getting ready for the day.

[¶ 13]  In November 2010, in preparation for a permanent guardianship hearing, Clarence Erickson was evaluated by Dr. David Brooks. Dr. Brooks found Clarence Erickson suffered from neurological impairment, was not competent to make decisions, and required 24–hour supervision. His pattern of performance was consistent with probable dementia of the Alzheimer's type. Dr. Brooks opined it was very likely Clarence Erickson would have been impaired a month or two before the evaluation, maybe even a few months before, but Dr. Brooks could not come to a conclusion about whether impairment existed earlier in time. Although Dr. Brooks had no contact with Clarence Erickson prior to the evaluation, the doctor indicated that one symptom of later-stage dementia is inability to remember the names of family members.

[¶ 14] Following hospitalization, Clarence Erickson was moved into a nursing home, where he resided until his death in December 2010. Curtis Erickson first became aware of Clarence Erickson's will while making funeral arrangements. Curtis Erickson also noticed several irregularities in the will: There were multiple misspellings of Clarence Erickson's children's names, and two of Clarence Erickson's stepchildren had been inexplicably left out of the will, despite testimony that Clarence Erickson tried to treat all the kids equal.

[¶ 15] On September 21, 2011, Curtis Erickson filed a petition to rescind transactions and to deem decedent's will invalid, arguing undue influence, duress, misrepresentation, and incompetence. A one-day bench trial was held in January 2013. Following trial, the district court entered a judgment concluding that undue influence was exerted over Clarence Erickson when executing his will and while transferring real and personal property to the appellants, that Clarence Erickson lacked capacity to transfer the money and real property, and that Clarence Erickson lacked testamentary capacity to execute the challenged will.

[¶ 16] The appellants moved to amend the district court findings and judgment pursuant to N.D.R.Civ.P. 52(b), arguing there was insufficient evidence in the record to support the findings that undue influence had been exerted and that Clarence Erickson lacked capacity to execute his will and to transfer money and real property. The district court denied the appellants' Rule 52(b) motion. The appellants then moved to correct the district court judgment pursuant to N.D.R.Civ.P. 60(a), arguing that the district court should account for the repayment of the purchase prices paid by the appellants for the real property transfers invalidated by the district court judgment.

[¶ 17] Before the district court ruled on the appellants' Rule 60(a) motion, the appellants filed a notice of appeal, appealing both the district court judgment and the order denying the appellants' Rule 52(b) motion. The appellants then filed a motion with this Court to remand the case to the district court for consideration of their pending Rule 60(a) motion, and this Court temporarily remanded the case. Following a hearing, the district court granted the appellants' Rule 60(a) motion and filed an amended judgment which included reimbursements to the appellants for the consideration paid for the invalidated real property transfers. The case then returned to this Court. No appeal was taken from the amended judgment.

## II

[¶ 18] On appeal, the appellants argue the district court erred in concluding undue influence was exerted over Clarence Erickson when executing his will and while transferring real and personal property to the appellants. The appellants also argue the district court erred in concluding that Clarence Erickson lacked capacity to transfer real and personal property on the dates in question. Finally, the appellants argue the district court erred in concluding that Clarence Erickson lacked testamentary capacity to execute a will.

### A

[¶ 19] A determination of mental capacity, including testamentary capacity, is a question of fact that this Court will set aside on appeal only when clearly erroneous. *Estate of Wenzel–Mosset by Gaukler v. Nickels*, 1998 ND 16, ¶ 14, 575 N.W.2d 425; *Matter of Estate of Wagner*, 551 N.W.2d 292, 295 (N.D.1996). The determination of whether undue influence occurred is also a question of fact subject to the clearly erroneous standard of review.

*Estate of Robinson,* 2000 ND 90, ¶ 11, 609 N.W.2d 745; N.D.R.Civ.P. 52(a). "In applying the 'clearly erroneous' standard, we do not substitute our judgment for that of the trial court." *Brash v. Gulleson,* 2013 ND 156, ¶ 14, 835 N.W.2d 798 (citation omitted). "It is not sufficient that we merely may have viewed the facts differently if we had been the trier of fact." *Id.* (citation omitted). "A trial court's choice between two permissible views of the weight of the evidence is not clearly erroneous, and simply because we may have viewed the evidence differently does not entitle us to reverse the trial court." *RRMC Constr., Inc. v. Barth,* 2010 ND 60, ¶ 7, 780 N.W.2d 656 (citation omitted). A finding of fact rises to the level of clearly erroneous only "if it is induced by an erroneous view of the law, if no evidence supports it, or if, on the entire record, this Court is left with a definite and firm conviction a mistake has been made." *Estate of Robinson,* at ¶ 11 (citing *Matter of Estate of Nelson,* 553 N.W.2d 771, 773 (N.D. 1996)).

B

[¶ 20] The appellants argue the district court's finding that Clarence Erickson lacked testamentary capacity to execute his will is clearly erroneous. This Court often quotes a passage from *Stormon v. Weiss,* 65 N.W.2d 475, 504–05 (N.D.1954), to explain testamentary capacity:

Testator must have sufficient strength and clearness of mind and memory, to know, in general, without prompting, the nature and extent of the property of which he is about to dispose, and nature of the act which he is about to perform and the names and identity of the persons who are to be the objects of his bounty, and his relation towards them. He must have sufficient mind and memory to understand all of these facts; . . . .

He must also be able to appreciate the relations of these factors to one another, and to recollect the decision which he has formed.

*See, e.g., Estate of Dion,* 2001 ND 53, ¶ 39, 623 N.W.2d 720. "A will contestant has the burden of proving testamentary incapacity by a preponderance of the evidence." *Id.* at ¶ 40 (citing *Matter of Estate of Wagner,* 551 N.W.2d at 296).

[¶ 21] In this case, the district court found:

Dr. Brooks conducted an examination of Clarence on November 10, 2010, and determined that Clarence was suffering from moderate to severe neurological impairment, probable Alzheimer's dementia, rendering him incompetent to make decisions. During his deposition, Dr. Brooks testified that his diagnosis would have been applicable as far back as . . . two to three months prior to his examination of Clarence. Thus, in Dr. Brooks' opinion, Clarence would have been incompetent to make decisions since mid-August of 2010. The Will in question was executed by Clarence on September 16, 2010, thereby falling well within the period of neurological impairment opined by Dr. Brooks. Evidence was also provided that Clarence had been exhibiting signs of incompetence since at least the fall of 2009. Clarence's inability to perform basic math, a skill which he had previously been able to do without difficulty, as well as his inability to recognize family members are two such examples.

The district court therefore determined that Clarence Erickson "did not have 'sufficient strength and clearness of mind and memory' to understand his actions when he executed his will on September 16, 2010."

C

[¶ 22] The appellants argue the district court's findings that Clarence Erickson lacked the mental capacity to transfer money and real property are clearly erroneous. Rescission of a contract on the ground of mental incapacity is authorized by N.D.C.C. § 14–01–02. "A conveyance or other contract of a person of unsound mind, but not entirely without understanding, made before the person's incapacity has been determined judicially upon application for the appointment of a guardian is subject to rescission as provided by the laws of this state." N.D.C.C. § 14–01–02. "Before a court may set aside a transaction on the ground of mental incapacity, the party attacking the validity of the transaction must show the grantor, at the time of the transaction, was so weak mentally as not to be able to comprehend and understand the nature and effect of the transaction." *Estate of Nelson,* 553 N.W.2d at 773 (citations omitted). "Old age alone does not render a person incompetent, even if the mind is weak or impaired or even if capacity to transact general business may be lacking." *Estate of Wenzel–Mosset by Gaukler,* 1998 ND 16, ¶ 13, 575 N.W.2d 425 (citing *Slorby v. Johnson,* 530 N.W.2d 307, 309 (N.D. 1995)).

[¶ 23] In this case, the district court found:

[T]he petitioner, Curtis Erickson, has provided evidence establishing that the decedent, Clarence Erickson, was unable to comprehend the nature and effect of the sale of his real property to Bobby and Dean and the transfer of money in the form of checks issued to Dean and Sue. Dr. Brooks determined that Clarence suffered from moderate to severe neurological impairment, was incompetent to make decisions and required 24–hour supervision. In particular, Clar-ence exhibited severely subnormal problem-solving skills. While Dr. Brooks stated that Clarence could have been exhibiting symptoms of dementia for the last year or two, he could not provide an opinion as to Clarence's mental status at the time the warrant[y] deeds were executed or when the dementia started. Although, Dr. Brooks indicated that Clarence was likely in a similar mental condition a month or two before the evaluation. Dr. Brooks further stated that the course of Alzheimer's dementia is typically at most ten (10) years. Toward the end of the course, people will not be able to remember the names of people they knew well.

Prior to Dr. Brooks' examination, Clarence was noted to have a flat affect and exhibited more than mere difficulty remembering names; he did not even know who his sister was. For over a year prior to his death, Clarence exhibited difficulties performing basic math computation involving agricultural commodities, computations which Clarence had previously been able to regularly do with ease. Clarence was receiving 24–hour supervision from November of 2009. Given these facts, it is clear to this Court that Clarence was experiencing neurological impairment since at least the fall of 2009.

The sale price of Clarence's real property is also of significant concern to this Court. Clarence sold all of his real property for $200 per acre. Real property in the same area had sold for twice that price in the last two years. Further, at the time the warrant[y] deeds were executed, Clarence's real property was appraised at $450 per acre. There was no logical explanation provided to this Court that would justify the fire sale.

It can also not go unnoticed by the Court that Clarence had been living with Dean and Sue for the six months preceding the sale of real property during which time he was under their constant supervision. Prior to living with them, Bobby and Dean spent time with Clarence daily, sometimes several times a day. Further, almost immediately after Clarence's real property was transferred to Bobby and Dean, Clarence was moved to Bismarck.

The sale of the property does not reflect Clarence's prior expressed intentions to the parties. Bobby testified that Clarence "tried to treat all the kids the same[."] Selling the real property for less than half its value is not treating all the kids the same. It also directly contradicts Curtis' testimony that, historically, Clarence had expressed that upon his death, his children would have to decide how to divide "the farm[."]

. . . .

Sue had been writing Clarence's checks for over a year, since before his wife died in 2009. The dates of issuance (June 3, 2009; June 22, 2009; November 22, 2009; January 15, 2010; and February 15, 2010[) ] do not coincide with any particular event. There has been no assertion from either Dean or Sue that the checks were intended as payment for any caregiver services provided. There has been no explanation why three of the checks were made payable to Sue and two of the checks were made payable to Dean. None of the checks were listed in the check register. The checks were issued out of sequence. . . . Clarence's signatures vary greatly on each of the checks in question. With the exception of the checks written to Dean, Sue was the only person present when the checks were issued. No checks were issued to any of Clarence's other children or stepchildren.

The district court determined Clarence Erickson "lacked the mental capacity to comprehend the meaning and effect of the transfer of his real property to Bobby and Dean." The district court also found Clarence Erickson was "not capable of understanding the nature and effect of the sale of his real property and monetary transfers to Dean and Sue."

## D

[¶ 24] The appellants argue the district court's findings of undue influence with respect to the execution of Clarence Erickson's will are clearly erroneous.

This Court has defined undue influence in the context of a will contest as the substitution of the purpose and intent of one exercising influence for the purpose and intent of the testator. To establish undue influence, the person challenging the will must prove 1) a testator subject to undue influence; 2) the existence of the opportunity to exercise undue influence; 3) a disposition to exercise undue influence; and 4) a result that appears to be the effect of undue influence.

*Estate of Vestre*, 2011 ND 144, ¶ 21, 799 N.W.2d 379 (citations and internal quotation marks omitted). This Court has noted "undue influence must be proven by the person contesting the will and . . . mere suspicion is not enough." *In re Estate of Stave*, 2007 ND 53, ¶ 13, 729 N.W.2d 706 (citing *Matter of Estate of Ostby*, 479 N.W.2d 866, 871 (N.D.1992)). Further, "Evidence which merely shows that a party who benefitted by the will had both motive and opportunity to exert influence over the testator is not sufficient to invalidate a will where there is no evidence that such influence was actually exerted." *Matter of Estate of Polda*, 349 N.W.2d 11, 14 (N.D.1984) (citation omitted). However, "Undue influence is seldom exercised

openly; because direct evidence is rarely available, undue influence may be proven by circumstantial evidence." *In re Estate of Robinson,* 2000 ND 90, ¶ 10, 609 N.W.2d 745 (citations omitted).

[¶ 25] In this case, the district court found:

On the issue of whether Clarence was subject to undue influence, Dr. Brooks testified that Clarence was suffering from moderate to severe neurological impairment, probable Alzheimer's dementia, rendering him incompetent to make decisions. In Dr. Brooks' opinion, Clarence would have been incompetent to make decisions after the first part of September of 2010. In addition, there was evidence of Clarence's declining mental sharpness in early 2009 evidenced by his inability to do simple math and to recognize his own sister. Given these facts, as well as those set forth above, this Court finds that Clarence was subject to undue influence.

The second factor this Court must address is whether the opportunity existed for undue influence to be exercised.... Given the daily contact between Bobby, Dean, and Sue with Clarence from the Spring of 2009 to November 2009, the constant supervision of Clarence by Sue and Dean from November of 2009 until March of 2010, and the constant supervision by Marion from March 2010 until Curtis was awarded temporary guardianship in October of 2010, this Court has determined an opportunity for undue influence existed. During the period Clarence lived with his stepchildren, he rarely saw his biological children; and when he did, the stepchildren were generally present. Sue accompanied Clarence to the majority of his medical appointments and drafted virtually all of Clarence's checks. Unlike in *Estate of Michelson* [*Mickelson*], where the decedent was known to be "his own boss," and the North Dakota Supreme Court determined the decedent was not susceptible to undue influence, Clarence was said to be passive and easily influenced in addition to being under the continuous care of the aforementioned stepchildren. 477 N.W.2d 247, 250 (N.D.1991).

The third factor to be considered is whether there was a disposition to exercise undue influence.... This Court also finds this factor to be clearly established. The Will disproportionately distributed assets to some children while completely leaving other children out of the Will. The only evidence received regarding this discrepancy was that the other children were not involved in Clarence's life as much as some of the children even though Bobby testified that Clarence had always treated his children equally. Curtis also testified that Clarence had expressed his intention to not have a Will and to leave division of the property up to the children after his death.

Finally, this Court must look to whether the result appears to be the effect of undue influence.... Again, this factor is clear to the Court. The stepchildren that had constant contact with Clarence prior to the temporary guardianship being ordered received the greatest benefits. Dean and Bobby purchased Clarence's real property for $200/acre when the property had a fair market value of $450 per acre at the time of the sale, thereby eliminating the distribution of the real property at the time of Clarence's death. Sue was writing checks for Clarence including several checks for thousands of dollars to Dean and herself but not to any of Clarence's other children and stepchildren. Marion drove Clarence, a ninety-one

(91) year old man, to Bowman for the sole purpose of transferring all of Clarence's bank accounts from Wells Fargo to Dakota Community Bank, Bobby's bank, and to execute his Will. Bobby met them on the street outside the bank to help with the transactions. The names of Clarence's biological children were misspelled in the Will. Bobby, Dean, and Marion were the only stepchildren included in the Will. Larry Olsen, Martin Olsen, and Ardis, the other three stepchildren, were omitted from the Will.

The district court determined the September 2010 will executed by Clarence Erickson resulted from undue influence.

### E

[¶ 26] The appellants argue the district court's findings of undue influence with respect to Clarence Erickson's transfers of money and real property are clearly erroneous. Analysis of an undue influence claim regarding a nontestamentary transaction differs slightly from analysis of an undue influence claim in the context of a challenge to the probate of a will. In cases involving nontestamentary transactions, this Court has defined undue influence as "improper influence [ ] exercised over the grantor ... in such a way and to such an extent as to destroy his free agency or his voluntary action by substituting for his will the will of another." *Johnson v. Johnson*, 85 N.W.2d 211, 221 (N.D.1957). In nontestamentary cases, this Court has held "[a] finding of undue influence ... requires that three factors be established: (1) A person who can be influenced; (2) The fact of improper influence exerted; and (3) Submission to the overmastering effect of such unlawful conduct." *Sulsky v. Horob*, 357 N.W.2d 243, 248 (N.D.1984) (citing *Kronebusch v. Lettenmaier*, 311 N.W.2d 32, 35 (N.D. 1981)).

[¶ 27] In this case, the district court found:

Clarence was capable of being influenced. Evidence was provided establishing that Clarence was unable to care for himself. Clarence had not driven a motor vehicle since 2006, and had difficulty seeing due to macular degeneration. From November of 2009 to March of 2010, Clarence lived with Dean and Sue; they would not leave Clarence unattended for any period of time. Clarence was dependent upon Sue for care dating back to the time before Clarence even began living with them. During the period from Clara's death in the spring of 2009 to November of 2009, Bobby, Dean or Sue had daily contact with Clarence, sometimes stopping over several times a day. Sue wrote Clarence's checks and took him to doctor's appointments. At the appointments, Sue, not Clarence, did all the talking. While Dr. Brooks could only testify that Clarence was neurologically impaired from approximately mid-August of 2010 based on his evaluation, this Court found that from all the evidence provided, Clarence's neurological impairment was evident for the preceding year.

The second factor the Court must assess is whether improper influence was exerted.... This Court also finds that the second factor has been established through the same evidence previously discussed. Of particular note are the living arrangements from November 2009, which gave Dean and Sue 24–hour contact with Clarence, Sue's handling of Clarence's checking account, the sale of Clarence's real property for less than half its market value, and the timing of the transfer and relocation of Clarence to Bismarck. The totality of the circumstances and the direct contradiction of the transfers with Clarence's expressed

intent to both Curtis and Bobby clearly establish to this Court that improper influence was exerted.

The final factor to consider is whether there was submission to the overmastering effect of such unlawful conduct.... Once again, this Court finds that the evidence, as stated above, establishes that the transfers of real property and money in the form of checks was the result of the overmastering effect of Bobby's, Dean's and Sue's conduct. The only evidence provided to this Court regarding Clarence's desire as to sell his real property or transfer the money was from those who benefitted directly. Yet, even their respective testimony reflected contradictions with Clarence's expressed intent to treat all of the children the same.

The district court therefore determined that "the warranty deeds and checks were created and signed as a result of undue influence."

F

[¶ 28] This case largely consisted of "he said, she said" evidence which told two, very different stories. Curtis Erickson's testimony painted Clarence Erickson as an individual who had been experiencing mental deficiencies for several years and who had been entirely dependent on family members during the period of time that the transactions and will execution occurred. Bobby Olsen, Sue Olsen, Dean Olsen, and Marion Bergquist all testified that they never saw any decline in Clarence Erickson's mental health at any point before his death and that Clarence Erickson favored them in the monetary and real estate transactions and in his will because of their excellent relationships with him. The only opinion offered by a non-party was the deposition of Dr. Brooks, who opined that it was very likely Clarence Erickson would have been impaired up to

a few months before the evaluation, who would not speculate beyond that time frame, but who testified that the indicia relied upon by the district court are signs of impairment.

[¶ 29] In its findings of fact, conclusions of law, and order for judgment, the district court correctly applied the relevant law to each of the four issues and clearly articulated the bases for its findings. While this Court may have viewed the facts differently had we been sitting as the trier of fact, our standard of review on appeal is clearly erroneous. There is evidentiary support for the district court's findings. The district court chose to view the evidence in a light that favored Curtis Erickson's case. That view was permissible based on the record before the district court, and we will not substitute our judgment for that of the district court. We hold the district court's findings of fact are not clearly erroneous.

III

[¶ 30] The appellants' notice of appeal indicates that they are, in part, appealing the district court's order on their Rule 52(b) motion to amend the district court's findings and judgment. However, this Court has held that orders on Rule 52(b) motions are not appealable. *Alliance Pipeline L.P. v. Smith*, 2013 ND 117, ¶ 9, 833 N.W.2d 464. Therefore, to the extent the appellants' appeal is based on the district court's Rule 52(b) order, that portion of the appellants' appeal is dismissed.

IV

[¶ 31] The district court's findings that undue influence was exerted over Clarence Erickson when executing his will, that Clarence Erickson lacked testamentary ca-

pacity to execute a will, that undue influence was exerted over Clarence Erickson when transferring money and real property to the appellants, and that Clarence Erickson lacked capacity to transfer money and real property, were not clearly erroneous. We affirm the district court judgment. The appellants' appeal of the district court's Rule 52(b) order is dismissed.

[¶ 32]   GERALD W. VANDE WALLE, C.J., LISA FAIR McEVERS, DANIEL J. CROTHERS, and DALE V. SANDSTROM, JJ., concur.